UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
:
DAVID LAW,                           :     Case No.: 19-cv-8904
:
Plaintiffs,              :     **COMPLAINT**
:
vs.                              :     **DEMAND FOR JURY TRIAL**
:
ALDER BIOPHARMACEUTICALS INC.,       :
ROBERT AZELBY, PAUL CARTER, PAUL     :
CLEVELAND, JEREMY GREEN, A. BRUCE    :
MONTGOMERY, HEATHER PRESTON,         :
CLAY B. SIEGALL, and WENDY YARNO,    :
:
Defendants.              :
:
------------------------------------- X

Plaintiff David Law ("Plaintiff"), by and through his attorneys, allege the following upon

information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon

personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.      This is an action brought by Plaintiff against Alder BioPharmaceuticals, Inc..

("Alder" or the "Company") and the members of the Company's board of directors (collectively

referred to as the "Board" or the "Individual Defendants" and, together with Alder, the

"Defendants") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act

of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States

Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9").

Plaintiffs' claims arise in connection with the proposed tender offer ("Tender Offer") by H.

Lundbeck A/S ("Parent") through its subsidiary Violet Acquisition Corp. ("Purchaser," and

collectively with Parent, "Lundbeck"), to acquire all of the issued and outstanding shares of Alder (the "Proposed Transaction").

2.      On September 16, 2019, Alder entered into an agreement and plan of merger, (the "Merger Agreement"), whereby shareholders of Alder common stock will receive (i) $18.00 in cash for each share of Alder common stock they own (the "Closing Amount"), plus (ii) one contingent value right, (a "CVR"), which represents the right to receive $2.00, net to the seller in cash, without interest, at the time provided in the Contingent Value Rights Agreement (the "CVR Agreement), for each share of Alder common stock they own (the "Milestone Payment" and together with the Closing Amount, the "Offer Price").

3.      On September 23, 2019, in order to convince Alder shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC").  In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the sales process; (ii) the fairness opinion and financial analyses performed by the financial advisor to the Company, Centerview Partners LLC ("Centerview"); and (iii) certain financial projections prepared by Alder and relied upon by Centerview.

4.      The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on the date that is twenty (20) business days following the commencement of the Offer (the "Expiration Date").  It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5.      For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Alder's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id*. at 1316.

8.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Alder's common stock trades on the Nasdaq Global Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District

appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Alder's common stock.

10.     Defendant Alder is a Delaware corporation and maintains its principal executive office at 11804 North Creek Parkway South, Bothell, Washington 98011.   Alder is a pharmaceutical development company that specializes in the identification, development and manufacture of antibody therapeutics.  The Company's common stock trades on the Nasdaq under the ticker symbol "ALDR".

11.     Defendant Robert Azelby ("Azelby") is, and has been at all relevant times, the Chief Executive Officer and a director of the Company.

12.     Defendant Paul Carter ("Carter") is, and has been at all relevant times, a director of the Company.

13.     Defendant Paul Cleveland ("Cleveland") is, and has been at all relevant times, a director of the Company.

14.     Defendant Jeremy Green ("Green") is, and has been at all relevant times, a director of the Company.

15.     Defendant A. Bruce Montgomery ("Montgomery") is, and has been at all relevant times, a director of the Company.

16.     Defendant Heather Preston ("Preston") is, and has been at all relevant times, a director of the Company.

17.     Defendant Clay B. Siegall ("Siegall") is, and has been at all relevant times, a

director of the Company.

18.     Defendant Wendy Yarno ("Yarno") is, and has been at all relevant times, a director of the Company.

19.     The defendants identified in paragraphs 11-18 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A.  Background and the Unfair Offer Consideration

20.     Alder is a clinical-stage biopharmaceutical company based in Bothell, Washington that discovers, develops and seeks to commercialize therapeutic antibodies with the potential to meaningfully transform the treatment paradigm in migraine.

21.     Alder focuses its resources and development principally on Eptinezumab (ALD403), Alder's solely-owned lead investigational product candidate, in order to maximize its therapeutic and commercial potential.  Eptinezumab is administered through an infusion procedure and is currently in its Phase 3 clinical trials.  Alder is committed to commercializing Eptinezumab in the United States as a migraine prevention therapy.

22.     Alder's other product candidate is ALD1910, which also holds potential as a migraine treatment.

23.     The Company was founded in the early 2000s as a Delaware corporation and went public with the issuance of its Initial Public Offering on May 8, 2014.

21.     The Company has been extraordinarily successful and is well-positioned for continued growth thanks to the upcoming launch of Eptinezumab and the advancement of ALD1910.  For example, on August 6, 2019 – just a month before the Company announced that it was being acquired by Lundbeck– the Company issued a press release entitled *Alder*

*Biopharmaceuticals® Reports Second Quarter 2019 Financial and Operating Results*, which

stated in part:

> "We continue to make significant progress toward the potential launch of eptinezumab in the U.S. in the first quarter of 2020. We have our commercial leadership team in place, with experienced personnel leading sales, marketing and market access. The team is sharpening our go-to-market strategy and expects to complete our commercial footprint later this year. We recently presented additional data further confirming eptinezumab's differentiated clinical profile and benefits in patient-reported outcomes at the 2019 American Headache Society and American Academy of Neurology Annual Meetings," said Bob Azelby, Alder's president and chief executive officer. "***Looking forward, we believe there is a large opportunity to build value at Alder in the latter half of the year, with the initiation of eptinezumab's acute study and the advancement of our product candidate, ALD1910, into the clinic.*** These collective activities align with our mission to forever change the migraine treatment landscape and give people with migraines their lives back."

22.     Indeed, on the August 6, 2019 conference call accompanying the release of these

financial results, Azelby explained that the Company expected "the potential launch of our first

product in a little over six months," and that assuming the Company obtained FDA approval for

Eptinezumab, "Alder will be ready to competitively launch in the U.S. migraine prevention market

during the first quarter of 2020."   Azelby further explained that, while commercial value of

Eptinezumab would begin to be unlocked in the immediate short-term with its upcoming launch,

Alder was focused on becoming a fully-integrated company and also  anticipated long-term growth

and significant value tied to its preclinical drug ALD1910:

> We continue to plan to initiate a Phase III clinical trial of epti in the second half of 2019 to investigate this opportunity clinically. If approved for the prevention of migraine and its successful in treating an active migraine and clinical testing, Epti would be the only anit-CGRP monoclonal antibody indicated for the treatment and prevention of migraine.
>
> In our commercial assessment a treat-and-prevent label showed substantial increases in market share in the prevention marketplace. This research was further corroborated by first world therapy trends that indicated an anti-CGRP math with a treat-and-prevent label would be a strong driver of brand choice. ***And as we continue our focus on becoming a fully integrated company transforming migraine treatments, we hope you can see our***

*excitement about ALD1910, our preclinical asset, which has the potential to address another subset of migraine patients who may not respond to anti-CGRP therapy.*

ALD1910 is our high specificity, high affinity neutralizing investigational monoclonal antibody with reactivity to PACAP or pituitary adenylate cyclase-activating peptide. PACAP has emerged as an important signaling pathway in the pathophysiology of migraine and is believed the be distinct from CGRP. As such, *we believe PACAP represents an attractive novel target and we are very encouraged by our preclinical work-to-date, which suggests that ALD1910 prevents the signaling of PACAP for all three known receptors.*

The preclinical program is on track for completion this summer and we expect to initiate a first in human clinical study by the end of 2019. In summary, we are very excited about the near and long-term potential for epti and are working hard to ensure its commercial success, while also pursuing a portfolio of additional indications and new therapy that could potentially help migraine patients in the future.

23.     As the Company was just beginning to unlock the commercial value in its Eptinezumab asset and expected to derive continued long-term value from its ALD1910 asset, the Proposed Transaction comes at a time when the Company's recent and future success was not fully reflected by its share price.  The Proposed Transaction will cash-out Alder's stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares.

24.     Despite Alder's intrinsic value and exceptional growth prospects, the Individual Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which has caused Plaintiffs and the Class to receive an inadequate Offer Consideration.

**B.     The Proposed Transaction**

25.     On September 16, 2019, Alder and Lundbeck jointly announced the Proposed Transaction in a Press Release entitled *Lundbeck to acquire Alder BioPharmaceuticals – a*

*company committed to transforming migraine treatment and prevention – in a transaction valued*

*at up to USD 1.95 billion net of cash*, which stated as follows:

> VALBY, Denmark and BOTHELL, Wash., Sept. 16, 2019 (GLOBE NEWSWIRE) -- H. Lundbeck A/S (Lundbeck) and Alder BioPharmaceuticals (NASDAQ: ALDR) (Alder) today announced a definitive agreement for Lundbeck to acquire Alder. Under the terms of the agreement, Lundbeck will commence a tender offer for all outstanding shares of Alder, whereby Alder stockholders will be offered an upfront payment for USD 18.00 per share in cash, along with one non-tradeable Contingent Value Right (CVR) that entitles them to an additional USD 2.00 per share upon approval of eptinezumab by the European Medicines Agency (EMA), representing a total potential consideration of USD 20.00 per share. The transaction is valued at up to USD 1.95 billion (approximately DKK 13 billion) net of cash, on a fully diluted basis.

> Alder is a clinical-stage biopharmaceutical company committed to transforming migraine treatment through the discovery, development and commercialization of novel therapeutic antibodies. Through this acquisition, Lundbeck will continue to expand the range of brain diseases for which the company brings its leading and best-in-class therapies to patients. In addition, by acquiring Alder, Lundbeck will further enhance its capabilities to deliver future biological innovations in brain diseases.

> Alder is developing eptinezumab for the preventive treatment of migraine in adults. Eptinezumab is an investigational monoclonal antibody (mAb) that is administered as a quarterly 30-minute IV infusion. Eptinezumab was designed for immediate and complete bioavailability with high specificity and strong binding for suppression of calcitonin gene-related peptide (CGRP), a neuropeptide believed to play a key role in mediating and initiating migraines. If approved by the U.S. Food and Drug Administration (FDA), it will be the first IV CGRP therapy for migraine prevention. Alder is also developing ALD1910, a mAb designed to inhibit pituitary adenylate cyclase-activating polypeptide (PACAP) for migraine prevention. Eptinezumab, together with ALD1910, will help establish Lundbeck as an emerging leader in migraine and other pain syndromes.

> Alder submitted a Biologics License Application (BLA) to the FDA for eptinezumab in February 2019 and the FDA has set a Prescription Drug User Fee Act (PDUFA) action date of 21 February 2020. Lundbeck expects to submit eptinezumab for approval to regulatory authorities in the European Union during 2020, followed by submissions for approval in other regions around the world including China and Japan.

> **Strategic benefits**
> The proposed transaction is anticipated to significantly strengthen Lundbeck's business as early as 2020, accelerating the build of Lundbeck's late-stage pipeline and providing access to new capabilities in the monoclonal antibody field. The addition of eptinezumab will expand Lundbeck's leading global brain disease franchise. Lundbeck intends to leverage its proven expertise in neuroscience, and its highly effective organization across

56 countries, to maximize the opportunity to serve patients suffering from brain diseases, including migraine.

The acquisition of Alder will support Lundbeck's aim to deliver long-term sustainable growth and is consistent with capital allocation priorities. The transaction is expected to accelerate and diversify Lundbeck's revenue growth with the expected U.S. launch of eptinezumab for preventive treatment of episodic and chronic migraine in 2020 and the expected expansion of indications for the product. Lundbeck will gain an early-stage antibody, ALD1910, against a separate target for migraine and other pain syndromes with the potential to leverage the expertise in migraine across a broader product offering. Lundbeck will also gain access to a team with strong monoclonal antibody expertise, accelerating Lundbeck's capabilities in this arena. The transaction is expected to be core EPS accretive in 2023 assuming FDA approval in the first quarter of 2020 followed by regulatory approvals in other regions including Europe.

**Dr. Deborah Dunsire, President and CEO of Lundbeck,** commented, "*Alder is an excellent strategic fit for Lundbeck's focused expertise in brain diseases and organizational capabilities. This transaction flows from our strategic intent to Expand and Invest to Grow. Migraine prevention is an attractive indication for us that leverages our specialized commercial expertise in delivering medicines for brain diseases. We expect the global launch of eptinezumab for the preventive treatment of migraine, as well as the further potential development of the product in additional indications, to accelerate Lundbeck's growth in the coming years.*"

"*As a global leader in neuroscience research with products registered in more than 100 countries and a strong network of neurology specialists, Lundbeck is the ideal partner to advance Alder's mission of changing the treatment paradigm for migraine prevention. We believe this positions eptinezumab for a successful launch both in and outside of the United States,*" **said Bob Azelby, Alder's president and chief executive officer.** "*Importantly, today's news provides Alder shareholders with significant and immediate cash value, as well as the ability to benefit further once eptinezumab is approved by the EMA. Looking ahead, we expect Lundbeck will leverage Alder's expertise in antibody development to explore additional indications for eptinezumab and continue the development of ALD1910.*"

**Terms, closing conditions and financing**
Under the terms of the agreement, Lundbeck will commence a tender offer for all outstanding shares of Alder, whereby Alder stockholders will be offered an upfront payment for USD 18.00 per share in cash, along with one non-tradeable Contingent Value Right (CVR) of USD 2.00 per share. The upfront cash consideration represents a 79% premium to Alder's shareholders based on the closing price on 13 September 2019 and an approximately 3% discount based on the 52-week high share price.

The non-tradeable CVR will be paid upon the approval by the European Commission of a "Marketing Authorization Application" in the European Union, through the centralized procedure. The terms of the CVR payment reflect the parties' agreement over the sharing

of potential economic upside benefits from such approval. There can be no assurance such approval will occur or that any contingent payment will be made.

Lundbeck will acquire any shares of Alder not tendered into the tender offer through a merger for the same per share consideration as will be payable in the tender offer. The merger will be effected as soon as practicable after the closing of the tender offer.

The Board of Alder has unanimously approved the transaction and Alder will file a recommendation to shareholders recommending they tender their shares to Lundbeck. The transaction is expected to close in the fourth quarter of 2019, subject to customary closing conditions, including the tender of more than 50% of all shares of Alder outstanding at the expiration of the offer and receipt of required regulatory clearances, which includes a Hart-Scott-Rodino review in the U.S. The terms and conditions of the tender offer will be described in the tender offer documents, which will be filed with the U.S. Securities and Exchange Commission.

Lundbeck expects to fund the acquisition through existing cash resources and bank financing.

**Advisors**
For Lundbeck, MTS Health Partners and PJT Partners are acting as the exclusive financial advisors and Baker McKenzie is acting as legal advisor in this transaction. For Alder, Centerview Partners is acting as exclusive financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP and Cooley LLP are acting as legal advisors.

26.     Rather than continuing to build upon Alder's improving prospects, the Offer Consideration being offered to Alder's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Alder common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

C.     **The Preclusive Deal Protection Devices**

27.     To the detriment of Alder shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

28.    The Merger Agreement contains a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

29.    The no-shop provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

30.    Further, the Board must provide Lundbeck with written notice of any Acquisition Proposal and must provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Offer and negotiate with Lundbeck following receipt of the notice, so that Lundbeck has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Offer.

31.    In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $87 million to Lundbeck with respect to any termination under the no-shop provisions.

32.    Furthermore, the Company previously executed standstill agreements with Don't Ask Don't Waive ("DADW") provisions with other potential counterparties, which prevent these potential counterparties from making unsolicited takeover proposals, which further restricts the Company's ability to entertain superior offers.

33.    Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for Alder shares in the Proposed Transaction and the Company's failure to perform a market check through formal

outreach to potential counterparties with respect to an strategic acquisition, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

34.     Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**D.      The Recommendation Statement Omits Certain Material Information**

> **(i)      The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

35.     On Page 13, the Recommendation Statement states that (i) Alder's management "began actively exploring a potential partnership regarding the commercialization of Eptinezumab outside of the United States (the "Ex-U.S. Partnership") in September 2018, (ii) Erin Lavelle ("Lavelle"), Alder's Chief Operating Officer, "reached out to twenty-one (21) potential counterparties" to determine their interest in an Ex-U.S. Partnership, that "Alder entered into non-disclosure agreements with eleven (11) counterparties, including Lundbeck, in anticipation of exchanging confidential information to evaluate an Ex-U.S. Partnership," (iii) "Alder entered into the Nondisclosure Agreement with Lundbeck on January 9, 2019, which contained a standstill provision," (iv) "two (2) other nondisclosure agreements entered into by Alder contained standstills which, by their terms, remain in effect following the announcement of this transaction and the execution of the Merger Agreement," (v) "one (1) of these two (2) counterparties did not pursue the Ex-U.S. Partnership after conducting preliminary due diligence investigations, and the other counterparty submitted terms of the Ex-U.S. Partnership that were not viewed as competitive by the Alder Board," (vi) "Lundbeck and nine (9) other counterparties conducted due diligence investigations on Eptinezumab with respect to a potential Ex-U.S. Partnership," and (vii) "Alder

received proposed term sheets from five (5) potential counterparties for the Ex-U.S. Partnership, including Lundbeck."

36.     However, the Recommendation Statement fails to disclose whether any of these potential counterparties—including the potential counterparties that remain subject to the standstill provisions in their nondisclosure agreements with Alder—actually expressed any interest in wholesale acquisition of Alder as opposed to an Ex-U.S. Partnership for the distribution of Eptinezumab, and if so the extent to which these potential counterparties expressed interest in wholesale acquisition.  Indeed, Page 13 of the Recommendation Statement states that "during the spring of 2019, management of Alder also met in person with various potential counterparties to discuss an Ex-U.S. Partnership, which meetings afforded Alder an opportunity to gauge interest expressed by these counterparties in other potential strategic transactions," and Page 15 states that "Centerview, at the Alder Board's direction, made additional inquiries in such process (two (2) inquiries before and one (1) inquiry after the receipt of the July 21, Proposal [from Lundbeck], and that in no instance had either Alder or Centerview received any indication of interest regarding the acquisition of Alder other than from Lundbeck," fails to disclose (i) *how many* potential counterparties were actually informed that Alder might be interested in potential strategic transactions other than an Ex-U.S. Partnership,  and (ii) whether Alder or Centerview actually informed these potential counterparties that Alder was interested in a strategic transaction involving wholesale acquisition.  The Recommendation Statement also fails to clearly state whether the statement that neither Alder nor Centerview "received any indication of interest regarding the acquisition of Alder" means that no potential counterparties expressed *any interest whatsoever* in a wholesale acquisition of Alder or instead means only that Alder did not receive any *formal* "indication of interest" as expressed in an acquisition proposal from a competing

counterparty. *Compare, e.g., Goodman v. Dohmen*, No. 15-cv-20, 2017 U.S. Dist. LEXIS 123738, at \*6-7 (C.D. Cal. Aug. 3, 2017) (using phrase "indication of interest" to mean a statement of general interest in an investment), *with, McMillan v. Intercargo Corp.*, No. 16963, 1999 Del. Ch. 95, at \*5-6 (Del. Ch. May 3, 1999) (discussing "a non-binding preliminary indication of interest in acquiring Intercargo for $ 14 per share, to be financed through a dividend and an offering of XL Capital stock."). This information is material to the Company's public shareholders because the failure to receive a *formal* indication of interest does not necessarily mean that alternative potential counterparties would not have participated in a bidding process to acquire the Company if the Company had solicited acquisition proposals and a market check is generally the best means of determining a company's fair value in an acquisition. *See, e.g., Koehler v. NetSpend Holdings, Inc.*, No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at \*47-56 (Del. Ch. May 21, 2013).

37.     The Recommendation Statement also fails to disclose the terms of the "proposed term sheets" from the five potential counterparties for the Ex-U.S. Partnership that Alder received in February and March 2019, including the terms "that were not viewed as competitive by the Alder Board," that were submitted by the potential counterparty that remains subject to the standstill agreement with Alder. As the management projections "assume[] a partnership with Lundbeck for the development of Eptinezumab outside of the United States," the Company's failure to disclose the terms of the Ex-U.S. Partnership proposals that Alder received make it impossible for the Company's public stockholders to evaluate the fairness of the Proposed Transaction.

**(ii)     The Recommendation Statement Contains False Statements and Omissions Related to the Management Projections and the Fairness Opinion**

38.     The Recommendation Statement also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the

Company's Financial Advisors performed to render the opinion because it does not provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion. Specifically, the Registration Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and the Financial Advisors' potential conflicts of interest. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Offer Price is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

39.     With respect to the Management Projections, the Registration Statement fails to disclose material information. With respect to these financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

40.     With respect to the Management Projections beginning on Page 26, the Recommendation Statement fails to provide all of the financial projections provided by Alder and relied upon by Centerview for purposes of the fairness analyses. Specifically, the Recommendation Statement does not provide projections for (i) adjusted depreciation & amortization, (ii) changes in net working capital, or (iii) capital expenditures.

Moreover, although the Recommendation Statement discloses some of the rationale and assumptions underlying the cash flow anticipated from its Eptinezumab assets under each of Case

A, Case B, and Case C, the Recommendation Statement omits entirely any of the assumptions underlying cash flows anticipated from its ALD1910 asset. As these projections anticipate cash flows through the year 2037, the failure to disclose the assumptions underlying the portion (if any) of those cash flows that are anticipated to be generated by the ALD1910 asset renders the Recommendation Statement false and misleading to the Company's public shareholders. *See, In re Celera Corp. S'holder Litig.*, Cons. C.A. No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *85 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012). Indeed, the failure to detail any of these assumptions renders the Management Projections and any analyses on which they are based especially misleading given Azelby's recent assertion that investors should consider the Company's "focus on becoming a fully integrated company transforming migraine treatments," and "see our excitement about ALD1910."

41.    The Recommendation Statement also omits material information regarding Centerview's Fairness Opinion and the various valuation analyses performed to render its opinion. The description of the Fairness Opinion fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

42.    With respect to Centerview's *Selected Public Company Analysis* beginning on page 31, the Recommendation Statement fails to disclose the actual criteria that Centerview relied on in selecting the companies. The Recommendation Statement includes a question-begging statement that these "Centerview deemed [these companies] comparable, based on its experience and professional judgment, to Alder" but fails to disclose any of the criteria that Centerview considered in employing "its experience and professional judgment." As a result, it is impossible for the Company's public shareholders to know whether Centerview actually based inclusion on objective criteria and whether Centerview improperly included certain outlier companies and excluded other

companies that were in fact more comparable to Alder. *See, e.g., In re PNB Hldg. Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at *25 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable companies analysis where the "comparable publicly-traded companies all were significantly larger than [the subject company], with one having total assets of $587 million as compared to [the subject company's] assets of $216 million").  The misleading effect of this omission is exacerbated because the Recommendation Statement fails to disclose any of the individual companies' multiples and further fails to disclose which and how many companies were excluded as "outliers" because of "Revenue multiples of greater than 30x," instead summarizing the selected companies' trading multiples by quartile only *after excluding* the "outlier" companies. Moreover, displaying the results based on their quartiles rather than the mean or range already reduces the effect of these outlier companies. Further, the Recommendation Statement fails to disclose any multiples based on Earnings, and further fails to disclose Centerview's rationale for valuing the Company based on a Revenue multiple rather than an Earnings multiple.  Deriving a valuation multiple based on "comparable" companies' revenue is false and misleading without the disclosure of the selected companies' earnings, which is necessary to determine whether the selected companies' revenue provides an accurate and fair benchmark on which to value the company.

43.     With respect to the *Selected Precedent Transactions Analysis* beginning on Page 32, the Recommendation Statement fails to disclose the criteria that Centerview relied on in selecting the companies.  The Recommendation Statement includes a question-begging statement that these "Centerview deemed [these companies] comparable, based on its experience and professional judgment, to Alder" but fails to disclose any of the criteria that Centerview considered in employing "its experience and professional judgment."  As a result, it is impossible for the

Company's public shareholders to know whether Centerview actually based inclusion on objective criteria and whether Centerview improperly included certain outlier transactions and excluded other transactions that were in fact more comparable to this acquisition. Again, the misleading effect of this omission is exacerbated because the Recommendation Statement fails to disclose any of the multiples for each transaction. Further, the Recommendation Statement fails to disclose any multiples based on Earnings, and further fails to disclose Centerview's rationale for valuing the Company based on a Revenue multiple rather than an Earnings multiple. Deriving a valuation multiple based on "comparable" transaction revenue multiples is false and misleading without the disclosure of the acquired companies' earnings, which is necessary to determine whether the selected companies' revenue provides an accurate and fair benchmark on which to value the company.

44.     With respect to Centerview's *Discounted Cash Flow Analysis* beginning on Page 33, the Recommendation Statement fails to disclose: (i) the inputs used for deriving Centerview's selected discount rate range of 11.0% to 13.0%, (ii) the rationale and basis for Centerview's assumption "that Alder's unlevered free cash flows would decline in perpetuity after December 31, 2037, at a rate of free cash flow decline year-over-year of 80.0%, (iii) whether stock-based compensation was treated as a cash or non-cash expense, and (iv) a full sensitivity table based on the entire range of discount rates. Without this information, it is impossible to determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value. Indeed, a banker can make any transaction seem "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration. Moreover, presenting a discounted cash flow analysis based on projections that included an Ex-U.S. Partnership with Lundbeck without providing any analysis or discussion of

the standalone company's value without an Ex-U.S. Partnership with Lundbeck, particularly because the Company's Board "considered, after discussions with representatives of Centerview and Alder's management, the possible alternatives to the Offer and the Merger, including the possibility of Alder remaining a stand-alone company*, with or without potential strategic collaborations, partnerships and licensing and other arrangements, such as the final terms of the Ex-U.S. Partnership with Lundbeck.*"  Recommendation Statement at 20.

45.    With respect to Centerview's *Stock Price Targets* analysis on Page 34, the Recommendation Statement states that Centerview observed targets "ranging from $9.00 to $36.00 per Share" but fails to disclose the individual price targets observed and fails to summarize those price targets in a meaningful way because it does not provide any breakdown or measurement of central tendency.  Without the individual price targets themselves, a quartile, quintile, or decile summary, or at a minimum some measurement of variance, it is impossible to tell whether the range fairly summarizes the data observed.

46.    With respect to Centerview's *Premium Analysis* on Page 34, the Proxy fails to disclose whether the selected transactions contemplated cash or stock-based consideration, fails to disclose the individual premiums paid in each transaction, and further fails to disclose whether Centerview made any attempt to account for "disturbances" to stock price that occurred prior to the announcement of a transaction, for example a "jump" in stock price that occurred because a company announced that it was anticipating a merger before any merger was, in fact, finalized. *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date

were less than fully confident ones."). All of this information is material to shareholders and the disclosure of the *Premium Analysis* without this information renders the Proxy false and misleading.

47.     The Proxy also fails to fully disclose all potential conflicts-of-interest for Centerview. This conflict of interest information is material to shareholders because it directly informs shareholders as to how much weight they should give to Centerview's Fairness Opinion.

48.     Pages 53-54 of the Proxy disclose that Centerview's fee is $35 million, of which only $3 million was payable upon the rendering of the opinion with the remaining $32 million payable contingent upon the consummation of the merger, and further states that "Centerview may provide financial advisory and other services to or with respect to Alder or Lundbeck or their respective affiliates in the future, for which Centerview may receive compensation," but fails to disclose whether any services are, in fact, mutually understood to be contemplated at this time between Centerview, Alder, and/or Lundbeck.

### <u>COUNT I</u>
**(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

63.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

64.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

65.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or

recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

67.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

68.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

69.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants

undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

70.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

<u>**COUNT II**</u>
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

71.     Plaintiffs incorporates each and every allegation set forth as if fully set forth herein.

72.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

73.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

74.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making

> such solicitation or recommendation and the information required
> by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair
> and adequate summary thereof.

75.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to
> make the required statements, in light of the circumstances under
> which they are made, not materially misleading.

76.     The omission of information from a recommendation statement will violate

Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the

omitted information.

77.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9

because it omits material facts, including those set forth above, that render the Recommendation

Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness

omitted the material information identified above from the Recommendation Statement, causing

certain statements therein to be materially incomplete and therefore misleading.  Indeed, while

Defendants undoubtedly had access to and/or reviewed the omitted material information in

connection with approving the Proposed Transaction, they allowed it to be omitted from the

Recommendation Statement, rendering certain portions of the Recommendation Statement

materially incomplete and therefore misleading.

78.     The misrepresentations and omissions in the Recommendation Statement are

material to Plaintiffs, and Plaintiffs will be deprived of her right to make a fully informed decision

if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages

C.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.


### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 25, 2019                    **MONTEVERDE & ASSOCIATES PC**

                                        By:  _/s/ Juan E. Monteverde_
                                            Juan E. Monteverde (JM-8169)
                                            The Empire State Building 350 Fifth
                                            Avenue, Suite 4405 New York, NY 10118
                                            Tel: (212) 971-1341
                                            Fax: (212) 202-7880
                                            Email: jmonteverde@monteverdelaw.com

                                            *Attorneys for Plaintiff*


**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com